### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW HAMPSHIRE

Steven J. Roy

    v.                            Case No. 13-cv-438-PB

New Hampshire Department of
Corrections, et al.

### REPORT AND RECOMMENDATION

Steven Roy, an inmate in the New Hampshire State Prison ("NHSP"), has sued in four counts, asserting claims under the Copyright Act, the due process clause of the Fourteenth Amendment to the United States Constitution, and the common law of New Hampshire.  Before this magistrate judge for a report and recommendation are defendants' motion for summary judgment and their supplemental motion for summary judgment.  Plaintiff objects.  For the reasons that follow, defendants' motions for summary judgment should be granted.

### Summary Judgment Standard

"Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  Ponte v. Steelcase Inc., 741 F.3d 310, 319 (1st Cir. 2014) (quoting Cortés-Rivera v. Dept. of

Corr., 626 F.3d 21, 26 (1st Cir. 2010)); see also Fed. R. Civ.
P. 56(a).  A factual "dispute [is] genuine if 'a reasonable
jury, drawing favorable inferences, could resolve it in favor of
the nonmoving party . . . .'"  Travers v. Flight Servs. & Sys.,
Inc., 737 F.3d 144, 146 (1st Cir. 2013) (quoting Triangle
Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir.
1999)).  "A fact is material if it could affect the outcome of
the suit under governing law."  Daniels v. Agin, 736 F.3d 70, 78
(1st Cir. 2013) (citing SEC v. Ficken, 546 F.3d 45, 51 (1st Cir.
2008)).  When ruling on a motion for summary judgment, the court
must "view[] the entire record 'in the light most hospitable to
the party opposing summary judgment, indulging all reasonable
inferences in that party's favor.'"  Winslow v. Aroostook Cnty.,
736 F.3d 23, 29 (1st Cir. 2013) (quoting Suarez v. Pueblo Int'l,
Inc., 229 F.3d 49, 53 (1st Cir. 2000)).

   "The nonmovant may defeat a summary judgment motion by
demonstrating, through submissions of evidentiary quality, that
a trialworthy issue persists."  Sánchez-Rodríguez v. AT&T
Mobility P.R., Inc., 673 F.3d 1, 9 (1st Cir. 2012) (quoting
Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006)).
Thus, "[c]onclusory allegations, improbable inferences, and
unsupported speculation, are insufficient to establish a genuine

dispute of fact." <u>Travers</u>, 737 F.3d at 146 (quoting <u>Triangle Trading</u>, 200 F.3d at 2).  "Rather, the party seeking to avoid summary judgment must be able to point to specific, competent evidence to support his [or her] claim." <u>Sánchez-Rodríguez</u>, 673 F.3d at 9 (quoting <u>Soto-Ocasio v. Fed. Ex. Corp.</u>, 150 F.3d 14, 18 (1st Cir. 1998)) (internal quotation marks omitted).

## **Background**

Unless otherwise indicated, the facts recited in this section are undisputed.

Before he was incarcerated in the NHSP, William Johnson worked in the computer industry and became familiar with Alpha4 and Alpha5, which are software development platforms.  In 1994, while he was an inmate at the NHSP, Johnson was given a job in the Information Technology Department ("ITD") of New Hampshire Correctional Industries ("NHCI").  In that position, he developed an Alpha4 database to manage data for the state related to off-highway recreational vehicles.

In 2001, Johnson was hired as a clerk in the NHCI furniture shop.  After Johnson told the co-manager of the furniture shop, Ken Thompson, of the benefits of establishing an Alpha5 database, Thompson "explained in explicit terms that he did <u>not</u>

hire [Johnson] to write software and did <u>not</u> want [him] doing <u>any</u> development on paid time." Defs.' Mem. of Law, Ex. V (Doc. No. 74-35) ¶ 3 (emphasis in the original). But, Thompson told Johnson that "if [he] wanted to write programs or design databases, [he] could 'play with the computers on [his] own time.'" <u>Id.</u> Over the next four years, Johnson wrote five pieces of business software, using the Alpha5 platform, and Beta tested them with furniture shop data and clerks. Johnson also designed several databases using the ACCESS platform. He did that work on what he refers to as "unpaid shifts" in the furniture shop, on NHCI computers. In 2002, the director of NHCI, Dennis Race, asked Johnson to allow the NHCI office staff to test one of his ACCESS databases. Johnson agreed, and that database later "became the central repository of all purchasing data for NHCI." <u>Id.</u> ¶ 7.

In 2004, Roy was hired by furniture-shop manager Guy Matthews. He worked first as a tailor, then as a chair caner. After Roy asked Matthews why he had been assigned those jobs, Matthews told him he "could 'play on the computer' on [his] unpaid shift." Defs.' Mem. of Law, Ex. T (Doc. No. 74-33) ¶ 5. Shortly thereafter, Johnson introduced Roy to Alpha5, and Roy made changes to Johnson's programs and databases (hereinafter

4

"business modules").  He also consolidated the business modules in various ways, and cross linked them.

In 2006, the NHCI shops failed an audit, and the new manager of the furniture shop, Victor Currier, made Roy the shop's inventory clerk.  Currier asked Roy to adjust one of Johnson's business modules to comply with the State of New Hampshire's accounting standards.  Roy agreed, and in making the requested adjustments, Roy converted Johnson's "Inventory" database from the ACCESS platform to Alpha5.  Thereafter, the furniture shop began using another one of Johnson's business modules.  At that point, Johnson and Roy began to insert a copyright notice into the software they developed.  By 2011, that notice read as follows:

> Copyright (c) 2006-2011, by Steven J. Roy and William Johnson.
> This source code is a component of JOINT, the Job Order Inventory Networked Tracking system.
> . . .  This software is the copywritten intellectual property of the above-listed authors and any additions, changes, or improvements by anyone else is, under copyright law, also the intellectual property of the authors.  This software is provided at no charge to the New Hampshire State Prison and New Hampshire Department of Corrections for its exclusive use at its facilities in New Hampshire.  . . .  Any sale, transfer, loan or other distribution of this software to any other person, corporation, entity, state or state agency is strictly forbidden without the written permission of the authors.

Defs.' Mem. of Law, Ex. B., Attach. 16 (Doc. No. 74-19).

From 2006 through 2009, Johnson and Roy continued to enhance the business modules on unpaid time.  In 2009, they began to merge the business modules into a single, large database application.  They performed some of that work, but not all of it, during hours they were employed in their prison jobs.

In 2008, Fred Nichols became the Administrator of NHCI and renamed it GraniteCor.[1]  After seeing a demonstration of the business modules, Nichols wanted a consolidated system that incorporated those modules to be placed on a centralized network and used by all of the GraniteCor shops.  Johnson and Roy spent about a year merging the business modules to create a combined database called "JOINT."  In mid-2011, "the JOINT system was ready for Beta testing and use by GraniteCor shops."  Defs.' Mem. of Law, Ex. V (Doc. No. 74-35) ¶ 17.  Johnson's affidavit continues:

> JOINT was deployed on a restricted-access network, with users having only "runtime" access and the inability to copy the software for personal use, disclosure or other publication.  The source code cannot be examined by "runtime" users due to internal

---

[1] Both Johnson and Roy have testified in affidavits that Nichols took the helm of NHCI in 2010.  But Nichols' start date does not appear to be a material fact, see Daniels, 736 F.3d at 78, and even if it was, the apparent disagreement over that fact is not a genuine dispute, see Travers, 737 F.3d at 146, because no reasonable jury could credit the testimony of Johnson and Roy over the testimony of Nichols on the question of when Nichols became the Administrator of NHCI.

protections in Alpha5.  In addition, Alpha5 encrypts
the design files to prevent external tampering by
editing programs.

Id. ¶ 18.  In Roy's words:

On July 1, 2011, the JOINT system was deployed to
several shops through the GraniteCor inmate network
and the shops began using it with "runtime-only"
access to manage their data."  . . .  Over time more
shops joined the network and more data was entered
into the JOINT system.

Defs.' Mem. of Law, Ex. T (Doc. No. 74-33) ¶ 20.

In February of 2012, Roy was barred for 90 days from

entering the North Yard, the part of the prison where GraniteCor

is located.[2]  Then, according to Roy's affidavit:

In late March 2012, inmate Ishmael Cintron began
working in the GraniteCor office.  While he was
intended to act as a backup to me, according to two
CI's (Confidential Informants) in the GraniteCor
office, Fred Nichols and Cintron discussed converting
the JOINT system into Microsoft SQL (Structured Query
Language) format and converting the existing source
code into some other language.

. . . .

I encountered Fred's newest programmer, Ishmael
Cintron in the prison library in May and June 2012.
He bragged about converting all 58 of the data tables
in JOINT to SQL format and was overwhelmed by [the]
sheer quantity of source code in JOINT.  . . .

. . .  On May 7, 2012 an office worker CI
informed me that Fred Nichols had directed Cintron to
begin rewriting the JOINT system into SQL.

---

[2] Roy's exclusion from the North Yard was subsequently
extended to two years.

Defs.' Mem. of Law, Ex. U (Doc. No. 74-34) ¶¶ 6, 8, 9.

GraniteCor stopped using JOINT under the following circumstances, described in the affidavit of the DOC's business systems analyst, Ronald Cormier:

> In August 2012, a security breach occurred within the New Hampshire State Prison.  As a result of this breach, GraniteCor Industries stopped using all of its integrated servers on August 25, 2012, and [the] NHDOC administration ordered that these servers be removed to a warehouse for secure storage.  To the best of my knowledge the integrated JOINT Software at issue is on these servers and is currently warehoused, and thus preserved.  . . .
>
> . . . GraniteCor stopped all usage of the integrated JOINT software when it removed the GraniteCor servers from use.  The integrated JOINT software has, therefore, not been used or altered in any way since August 2012 and will not be altered or utilized in any way in the future.  There is no intention to reinstall these servers or this software.

Pl.'s Reply, Ex. A (Doc. No. 19-1) ¶ 3-4.

However, after GraniteCor stopped using JOINT as a whole, at least one individual shop reverted to using one or more of the business modules that Johnson and Roy had developed prior to the completion of JOINT in 2011.  Roy says that he learned "that GraniteCor was still using [his] software in April of 2013." Defs.' Mem. of Law, Ex. U (Doc. No. 74-33) ¶ 16.  In a letter dated May 16, 2013, Roy told defendants' counsel: "I didn't know until May 13, 2013 . . . that some of the old GraniteCor inmate

computer workers . . . are using computers running my software TO THIS DAY!" Compl., Ex. EE (Doc. No. 5), at 1. Roy continued:

> This letter is to put you on notice that I am withdrawing any license express or implied that any division of the DOC may have been granted to use my software and demanding that, until a settlement establishes otherwise, DOC use of it or any derivations that GraniteCor staff may have created, cease. I still intend to seek monetary compensation for the unjust enrichment experienced by the DOC/NHCI/GraniteCor in using my software since 2001 and the apparent effort these entities have undertaken to conceal the continued use of it by treating me like some kind of pariah, exiling me, and blacklisting me.

Id. at 2. Four days later, Roy notified Nichols, by letter, that he was revoking the license he had granted the DOC to use JOINT. Finally, in a May 29, 2013, affidavit, Roy stated:

> Given that an inmate skilled in software design was commissioned to rewrite my software into a different language, I believe that copyright infringement is actively occurring at this time. "Borrowing" code snippets and extracting the features by analyzing the source code all constitute infringement on my copyright unless performed using a "double-blind" development process.

Defs.' Mem. of Law, Ex. U (Doc. No. 74-34) ¶ 19.

With regard to the current status of JOINT, the Commissioner of the New Hampshire Department of Corrections ("DOC"), William Wrenn, provided the following interrogatory answer:

In January of 2014, Ronald Cormier, NHDOC's business
systems analyst, ordered the cessation of any and all
use of software known as JOINT in the prison
industries shops.  In order to ensure that the
software was removed from the shops, Mr. Cormier
phoned each of the shop managers and asked if they
were still using JOINT in the shops.  From this, Mr.
Cormier learned that the upholstery shop in Concord
was still using that software as their customer and
inventory database.  Mr. Cormier instructed the
upholstery shop manager, Jerry Teal, and the inmate
clerks to move all of the upholstery shop's data
regarding their orders and inventory from the [JOINT]
tables into Microsoft Excel spreadsheets, to make one
copy of the software, and to delete all instances of
JOINT from the computers in the shop.  Mr. Cormier
permitted the upholstery shop two days to transfer
their data before deleting the system.  The copy that
Mr. Cormier requested . . . was for the purposes of
preserving the software for the current litigation.
The preserved copy of the software has not been
copied, modified, or even viewed since that date.

A few weeks after the removal of the software from the
upholstery shop, Mr. Cormier learned that there was
one other instance of JOINT running in the sign shop
that was being used solely for the limited purpose of
printing certificates for the inmate workers.  Upon
learning this, Mr. Cormier instructed the sign shop
manager, Alan Burgess, that the software was not to be
used and it was to be deleted immediately from that
computer.  The software was deleted immediately.

Several weeks later, Mr. Cormier returned to each of
the GraniteCor shops in Concord to verify that no
instances of use of the software remained.

. . . .

Also preserved and in possession of NHDOC's legal
counsel at the New Hampshire Attorney General's Office
are four GraniteCor disks entitled "Backup" each
created between September 2011 and January 2012.
While NHDOC's counsel has not reviewed these disks, it

is believed that they contain back-up copies of JOINT.
Defs.' Mem. of Law, Ex. C (Doc. No. 74-31), at 1-2 of 3.

In this action, Roy asserts: (1) a claim for injunctive relief for copyright infringement against the DOC and Nichols in his official capacity; (2) a claim for injunctive relief for a due-process violation against the DOC and against Nichols, Wrenn, and NHSP Warden Richard Gerry, in their official capacities; (3) a claim for unjust enrichment against the DOC and Nichols; and (4) a claim for conversion against the DOC and Nichols.  Without specifying the legal claims to which they apply, Roy requests the following forms of injunctive relief:

    b.   ORDER the DOC to forthwith preserve every disk drive, CD and DVD that contain[s] any version of the JOINT software, derivations thereof and predecessor modules that contributed to JOINT, including both Alpha5 format and ACCESS format versions;

    c.   ORDER the DOC to locate and return the three DVD archives that belong to the plaintiff and contain all of JOINT, its "help" files, its related files and directories, historical documents, development notes, and archive copies of the predecessor modules;

    d.   ENJOIN the DOC from using (1) any of the JOINT software package or part thereof, (2) any Alpha5 or ACCESS predecessor versions, (3) any derivative created from any portion of JOINT and (4) any source code segment, screen layout, or report layout extracted, copied or derived from JOINT or its predecessor modules;

11

    e.    ORDER the DOC to undertake verification, through
        examination of newer inmate-designed software,
        that all staff and inmate infringers of the JOINT
        software have complied with item "d" (above).

Am. Compl. (Doc. No. 45) 13.

## Discussion

For each of plaintiff's four causes of action, defendants
advance multiple arguments for summary judgment.  In the
discussion that follows, the court considers plaintiff's four
causes of action in turn.

A.   Copyright Infringement

Roy states his copyright infringement claim in the
following way:

> The plaintiff asserts that defendants Fred
> Nichols and the N.H. Department of Corrections,
> knowing that JOINT was a copywritten work, (a) engaged
> in the unauthorized creation of derivative works of
> JOINT, (b) used DOC funds to pay for the creation of
> unauthorized derivative works of JOINT, (c) utilized
> and modified JOINT without the plaintiff's permission
> after 6/11/2012, (d) copied JOINT from a secure
> mainframe . . . or other network location to user
> computers and copied it into the CPU's of those
> computers when they ran it after 6/11/2012, (e)
> secretly used JOINT after the 8/28/2012 alleged
> network shutdown, (f) failed to cease using JOINT when
> notified to do so, and (g) did all of this for
> commercial gain within the DOC's wholly owned
> GraniteCor business.[3]

---

[3] The date used in items (c) and (d) of Roy's claim, *i.e.*,
June 11, 2012, appear to be based upon the fact that on that

Am. Compl. (Doc. No. 45) 11.  All the conduct on which Roy bases his copyright infringement claim took place after Roy was banned from the North Yard and was no longer working in the GraniteCor furniture shop.

Defendants argue that they are entitled to judgment as a matter of law on plaintiff's copyright infringement claim because: (1) JOINT is a work for hire, which makes the DOC the owner of its copyright, not Roy; (2) Roy is precluded from bringing an infringement claim by the doctrine of equitable estoppel; and (3) Roy granted the DOC an implied irrevocable license to use JOINT, which bars his infringement claim. Defendants also argue that Roy's claim is moot because he has already received all of the injunctive relief he has requested for copyright infringement.  Assuming, without deciding, that JOINT is not a work for hire and that Roy owns a copyright on it, defendants are entitled to judgment as a matter of law because Roy's copyright infringement claim is moot and, in the alternative, because Roy has failed to produce evidence that defendants' use of JOINT exceeded the scope of the implied license he gave the DOC to use that software.

---

date, the Register of Copyrights issued Johnson and Roy a copyright registration form for JOINT.

1.   <u>Mootness</u>

Defendants argue that Roy's copyright infringement claim is moot because GraniteCor has ceased using JOINT, GraniteCor will not use JOINT in the future, and the DOC has preserved the existing copies of JOINT.  Roy does not challenge defendants' assertion that GraniteCor is no longer using JOINT, and limits his argument against dismissing his infringement claim as moot to contending that the injunctive relief he has requested is still necessary because "[t]he defendants have yet to return the three DVD archives listed in the COMPLAINT (Relief ¶c), and it has yet to be determined whether the preservation requested (Relief ¶b) has occurred."  Pl.'s Mem. of Law (Doc. No. 78-1) 22.[4]  Defendants have the better argument.

For this court to have jurisdiction over Roy's copyright infringement claim, "an actual controversy must exist."  <u>Matt v. HSBC Bank USA, N.A.</u>, 783 F.3d 368, 372 (1st Cir. 2015).  The

_____

[4] Roy elaborates on his argument that injunctive relief is still required:

> While Mr. Cormier stated that he "preserved" the (hacked) "pirate" copies of JOINT, there is no indication that the original (which was impounded for other reasons) has been preserved."  The GraniteCor network version(s) of JOINT are still unaccounted for.

Pl.'s Mem. of Law (Doc. No. 78-1) 22.

<u>Matt</u> court continued:

> "A case becomes moot — and therefore no longer a
> 'Case' and 'Controversy' for purposes of Article III —
> when the issues presented are no longer 'live' or the
> parties lack a legally cognizable interest in the
> outcome." <u>Already, LLC v. Nike, Inc.</u>, --- U.S. ----,
> 133 S. Ct. 721, 726 (2013) (per curiam) (quoting
> <u>Murphy v. Hunt</u>, 455 U.S. 478, 48 (1982)) (some
> internal quotation marks omitted).
>
> In other words, if a court may not provide "any
> 'effectual relief' to the potentially prevailing
> party," the case is moot. <u>Horizon Bank & Trust</u> [<u>v.
> Massachusetts</u>], 391 F.3d [48,] 53 [(1st Cir. 2004)]
> (quoting <u>Church of Scientology of Cal. v. United
> States</u>, 506 U.S. 9, 12 (1992)); <u>see also</u> <u>Pallazola v.
> Rucker</u>, 797 F.2d 1116, 1128 (1st Cir. 1986)
> ("[F]ederal courts are without power to decide
> questions that cannot affect the rights of litigants
> in the case before them.") (quoting [<u>North Carolina
> v.</u>] <u>Rice</u>, 404 U.S. [244,] 246 [(1971) (per curiam])
> (internal quotation marks omitted).

783 F.3d at 372 (parallel citations omitted). "When a case is

moot, 'dismissal of the action is compulsory.'" <u>Id.</u> (quoting

<u>Overseas Military Sales Corp. v. Giralt—Armada</u>, 503 F.3d 12, 17

(1st Cir. 2007); citing <u>Cruz v. Farquharson</u>, 252 F.3d 530, 533

(1st Cir. 2001)).

The owner of a copyrighted work has the exclusive right to

reproduce that work, prepare derivative works based upon it, and

distribute it. <u>See</u> 17 U.S.C. §§ 106 (1)-(3). Any person who

violates any of those exclusive rights infringes on the owner's

copyright. <u>See</u> 17 U.S.C. § 501(a). Statutory remedies for

infringement include both monetary damages, see 17 U.S.C. § 504, and injunctive relief, see 17 U.S.C. § 502.

As a result of previous rulings, the only remedy available to Roy for copyright infringement is injunctive relief.  Turning to that remedy:

> Any court having jurisdiction of a civil action arising under this title may . . . grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright.

17 U.S.C. § 502(a).  However, "a federal court may not grant injunctive relief when . . . intervening events have eliminated any reasonable anticipation that the aggrieved party will, in the future, be faced with a recurrence of the alleged harm." Goodwin v. C.N.J., Inc., 436 F.3d 44, 49 (1st Cir. 2006) (citing Cty. of L.A. v. Davis, 440 U.S. 625, 631 (1979); MGM v. 007 Safety Prods., Inc., 183 F.3d 10, 15 (1st Cir. 1999)).  In other words:

> "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."  O'Shea v. Littleton, 414 U.S. 488, 495-496 (1974).  To be entitled to a forward-looking remedy, a plaintiff must satisfy the basic requisites of equitable relief — "the likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law."  Id. at 502.  It is not enough for a plaintiff to assert that she "could be" subjected in the future to the effects of an unlawful policy or illegal

> conduct by a defendant — the prospect of harm must
> have an "immediacy and reality."  <u>Golden v. Zwickler</u>,
> 394 U.S. 103, 109 (1969).

<u>Steir v. Girl Scouts of the USA</u>, 383 F.3d 7, 16 (1st Cir. 2004)
(parallel citations omitted).

Here, assuming that Roy holds a copyright on JOINT, and
that the DOC's use of JOINT exceeded the scope of the implied
license that Roy concedes that he granted the DOC, <u>see</u> Pl.'s
Mem. of Law (Doc. No. 78-1) 19, Roy is reasonably protected
against infringement by the DOC as a result of actions that
DOC/NHSP officials have already taken.  It is undisputed that
the servers that ran the full version of JOINT are out of
service, that any freestanding business modules that predated
JOINT have been deleted from all GraniteCor computers, and that
GraniteCor has no intention of reinstalling either the out-of-
service servers or the JOINT software.  No other action is
reasonably necessary to prevent or restrain the NHSP from
infringing Roy's purported copyright in the future.  Thus, all
the reasonably necessary injunctive relief Roy requests has
already been provided.  Any additional injunctive would go
beyond what is reasonably necessary to prevent infringement, or
is otherwise inappropriate.

Starting with paragraph b of Roy's prayer for relief,
Cormier has testified under oath that the integrated version of
JOINT has been preserved by placing the servers that ran it in
storage and that the business modules that were used in the
furniture shop until January of 2014 have been preserved by
downloading them onto a compact disk.  Roy argues that there is
no indication that the "original" copy of JOINT has been
preserved, but he does not explain why preservation of that copy
is reasonably necessary to prevent future infringement, at least
in light of Cormier's unchallenged testimony that GraniteCor has
no intention of reinstalling JOINT.

Assuming that Roy is correct in asserting that the DOC has
not located or returned the three DVD archives he asks for in
paragraph c, he does not explain why the return of that material
is reasonably necessary to prevent future infringement, and the
court cannot see how such relief is necessary.

As for the paragraph d relief, an injunction against future
use of JOINT, its predecessors, and any derivative works, the
undisputed factual record demonstrates that the prospect of any
such future use of JOINT lacks the "immediacy and reality,"
Steir, 383 F.3d at 16, that is necessary to warrant forward-

looking injunctive relief.  Roy makes no argument to the contrary.

Finally, in paragraph e, Roy asks the court to order the DOC to examine any inmate-designed software currently in use to verify that it is not using any part of JOINT, its source code, its predecessors, or derivative works based on JOINT.  What Roy asks for in paragraph e sounds like a discovery request intended to uncover evidence of infringement rather than relief for a successful infringement claim.  But, in any event, it is undisputed that defendants have already verified that no GraniteCor shop is using any part of JOINT.  Thus, paragraph e requests no more than what has already been done.

Finally, it might appear at first blush that because defendants took the actions that have mooted Roy's copyright infringement claim, his claim is saved by what is known as the "voluntary cessation" exception to the mootness doctrine.  See ACLU of Mass. v. U.S. Conf. of Catholic Bishops, 705 F.3d 44, 54 (1st Cir. 2013) (referring to "the 'voluntary cessation' exception to mootness articulated in City of Mesquite v. Aladdin's Castle, 455 U.S. 283 . . . (1982)").  But, upon closer inspection, that exception is inapplicable to this case.

"As its name suggests, [the voluntary cessation] exception arises in situations where 'the defendant voluntarily ceases the challenged practice,' . . . thereby mooting the plaintiff's case."  ACLU, 705 F.3d at 54 (quoting D.H.L. Assocs., Inc. v. O'Gorman, 199 F.3d 50, 55 (1st Cir. 1999)).  However, "[t]he voluntary cessation doctrine does not apply when the voluntary cessation of the challenged activity occurs because of reasons unrelated to the litigation."  ACLU, 705 F.3d at 55 (quoting M. Redish, Moore's Federal Practice, § 101.99[2]; citing Jordan v. Sosa, 654 F.3d 1012, 1037 (10th Cir. 2011); Sze v. INS, 153 F.3d 1005, 1008-09 (9th Cir. 1998)).  Here, it is undisputed that defendants stopped using the integrated version of JOINT in response to a security breach at the prison, not in response to Roy's copyright infringement claims.  Thus, this is not a case in which defendants are attempting to "evade judicial review . . . by temporarily altering questionable behavior," ACLU, 705 F.3d at 54 (quoting City News & Novelty, Inc. v. City of Waukesha, 531 U.S. 278, 284 (2001)), in an attempt to "immmuniz[e] [themselves] from suit indefinitely, altering [their] behavior long enough to secure a dismissal and then reinstating it immediately after," id. at 54-55.  Accordingly, Roy is not

entitled to the benefit of the voluntary cessation exception to the mootness doctrine.

The bottom line is this.  The DOC and Nichols are entitled to dismissal of Roy's copyright infringement claim.  Even if he were to prevail on it, he would be entitled only to injunctive relief, and the appropriate injunctive relief he seeks has already been provided through the actions of the DOC.  For that reason, Roy's copyright infringement claim is moot and, as a consequence, should be dismissed.  See Matt, 783 F.3d at 372.

2.   Implied License

Even if the DOC and Nichols were not entitled to dismissal of Roy's copyright infringement claim on grounds of mootness, they would be entitled to judgment as a matter of law on that claim, because nothing they are alleged to have done exceeded the scope of the implied license that Roy granted the DOC.

Roy concedes that "NHDOC had an implied, nonexclusive license" to use JOINT.  Pl.'s Mem. of Law (Doc. No. 78-1) 19.  Such a "license is, by definition, of limited scope; it 'simply permits the use of a copyrighted work in a particular manner.'"  Estate of Hevia v. Portrio Corp., 602 F.3d 34, 41 (1st Cir. 2010) (quoting I.A.E., Inc. v. Shaver, 74 F.3d 768, 775 (7th Cir. 1996)).  Thus, "[u]ses of a copyrighted work that stay

within the bounds of an implied license do not infringe the

copyright." Id. (citing John G. Danielson, Inc. v. Winchester-

Conant Props., Inc., 322 F.3d 26, 40 (1st Cir. 2003)).

Accordingly, for defendants to be liable for copyright

infringement, Roy must allege, and then prove, that they used

JOINT in a manner that exceeded the scope of the license he

granted.

Roy correctly recites the rule that "[w]ith a nonexclusive

license, 'the licensor can still bring suit for copyright

infringement if the licensee's use goes beyond the scope of the

nonexclusive license.'"  Pl.'s Mem. of Law (Doc. No. 78-1) 19

(quoting MacLean Assocs., Inc. v. Wm. M. Mercer-Meidinger-

Hansen, Inc., 952 F.2d 769, 779 (3d Cir. 1991)).  Then he gets

to the heart of his claim:

> When the plaintiff discovered [in April of 2013] that
> JOINT was being used outside of the computer network
> on which he had installed it . . ., he realized that
> it must have been modified to overcome its internal
> security ("hacked"), a fact later confirmed at the
> 5/29/2014 evidentiary hearing in this case.  This
> certainly was activity beyond the scope of any
> nonexclusive license, and led to the plaintiff
> demanding Nichols and counsel cease-and-desist using
> JOINT.  When the demand was ignored, this litigation
> followed.
>
> . . .  The NHDOC using JOINT under such a license
> [i.e., an implied, nonexclusive license] does not give
> it the right to hack the software and overcome the
> security to COPY it to other computers, which it

indisputably did.

Pl.'s Mem. of Law (Doc. No. 78-1) 19 (citation to the record omitted).

The problem with Roy's argument is that after conceding that he had granted the DOC an implied license to use JOINT, he has produced no competent evidence that the license he granted the DOC did not allow the DOC to create derivative works of JOINT, use or modify JOINT after June 11, 2012, copy JOINT onto computers other than the one(s) on which he installed it, or use JOINT after the inmate network was shut down in late August of 2012. Rather, he treats it as self-evident that the conduct on which he bases his infringement claim exceeded the scope of the license he granted. That is insufficient.

"Courts focus on objective evidence revealing the intent of the parties to determine . . . the scope of [an implied] license." Latimer v. Roaring Toyz, Inc., 601 F.3d 1224, 1235 (11th Cir. 2010) (citing Wilchombe v. TeeVee Toons, Inc., 555 F.3d 949, 956 (11th Cir. 2009); Gracen v. Bradford Exch., 698 F.2d 300, 303 (7th Cir. 1983)). Moreover:

> In Asset Marketing Systems, Inc. v. Gagnon, the Ninth Circuit held that a copyright owner must express the intent to restrict the scope of a license when they deliver the copyright work. 542 F.3d 748, 756 (9th Cir.2008). Thus, an implied license will be limited

to a specific use only if that limitation is expressly
conveyed when the work is delivered.

Latimer, 601 F.3d at 1235.

Here, Roy has produced no evidence that he and Johnson
expressly told defendants, at the time they delivered JOINT,
that any of the acts on which Roy bases his infringement claim
fell outside the scope of the license they granted the DOC.  To
be sure, the copyright notice that Roy and Johnson inserted into
JOINT contained a restriction on the "sale, transfer, loan or
other distribution" of JOINT.  Defs.' Mem. of Law, Ex. B.,
Attach. 16 (Doc. No. 74-19).  But Roy's infringement claim is
not based upon allegations that defendants sold, transferred,
loaned, or distributed JOINT.  While Roy makes no such argument,
it could be argued that the security measures that Roy and
Johnson programmed into JOINT constituted limitations on the
scope of the license they gave the DOC to use JOINT.  Indeed,
both Johnson and Roy mention, in their affidavits, the
limitations on access they programmed into JOINT.  See Defs.'
Mem. of Law, Ex. V, Johnson Aff. (Doc. No. 74-35) ¶ 18; Ex. T,
Roy Aff. (Doc. No. 74-33) ¶ 20.  However, the copyright notice
Roy and Johnson inserted into JOINT states that "any additions,
changes, or improvements [of JOINT] by anyone else is, under
copyright law, also the intellectual property of the authors."

24

Id.  That language strongly suggests that the license Johnson and Roy gave the DOC actually contemplated and permitted the conduct they now identify as acts that went beyond the scope of the license they granted the DOC.  In short, there is no objective evidence demonstrating an intent on the part of Roy and Johnson to limit the license they granted the DOC to exclude the various acts on which Roy now bases his infringement claim.

Because Roy has identified no factual support for a claim that defendants' use of JOINT exceeded the scope of their license, defendants are entitled to judgment as a matter of law as to items (a) through (e) in Roy's claim for copyright infringement.

The only alleged act of infringement that stands on a slightly different footing is Roy's sixth one: "(f) [defendants] failed to cease using JOINT when notified to do so."  Am. Compl. (Doc. No. 45) 11.[5]  In Roy's view, he granted the DOC a revocable license to use JOINT, and his cease-and-desist letter validly revoked that license, rendering any use of JOINT after May of 2013 an act of infringement.  Defendants argue that Roy granted

---

[5] The seventh item listed in Roy's copyright infringement claim, i.e., that defendants "did all of this for commercial gain within the DOC's wholly owned GraniteCor business," Am. Comp. (Doc. No. 45) 11, does not allege an act of infringement.

the DOC an irrevocable license to use JOINT and urge the court to adopt the reasoning of Le v. City of Wilmington, 736 F. Supp. 2d 842, 852-52 (D. Del. 2010).

In Le, which bears many similarities to this case, the plaintiff employee contended that he gave his employer a revocable license to use software that he had written.  See 736 F. Supp. 2d at 853.  Judge Stark explained that "the conceded license Le granted the City is revocable only if Le was not provided any consideration for it."  Id. (citing Attig v. DRG, Inc., No. Civ.A.04-CV-3740, 2005 WL 730681, at *6 (E.D. Pa. Mar. 30, 2005); Lulirama, Ltd. v. Axcess Broad. Servs., Inc., 128 F.3d 872, 882-83 (5th Cir. 1997)).  In Le, the plaintiff "received consideration, beginning with his salary and also including the use of City equipment to test and refine the Work, the assistance of City employees in doing the same, access to the City's database, and an award for outstanding performance as a City employee."  736 F. Supp. 2d at 853.

Here, while Roy was not paid for all of the time he spent developing JOINT, it is undisputed that he was paid for some of it.  It is also undisputed that he was given the use of DOC computers to do that work, as well as access to data from various GraniteCor shops for Beta testing, and assistance from

fellow inmate Nate Ericson.  Based upon those undisputed facts,
Roy was provided with multiple forms of consideration for the
license he granted the DOC.  Accordingly, that the license was
irrevocable.  That makes Roy's letter of May 2013 a nullity and
entitles defendants to judgment as a matter of law on the
infringement claim Roy asserts in item (f).

###### 3.   Copyright Summary

The DOC and Nichols are entitled to dismissal of Roy's
copyright infringement claim because that claim is moot.  In the
alternative, if that claim is not moot, defendants are entitled
to judgment as a matter of law because Roy has produced no
evidence that would allow a reasonable jury to conclude that any
of defendants' allegedly infringing conduct exceeded the scope
of the implied license to use JOINT that he granted to the DOC.

### B.   **Due Process**

Roy next claims that the DOC, Wrenn, Gerry, and Nichols
violated his right to due process:

> Defendants failed to comply with the plaintiff's
> cease-and-desist notice that asserted his control over
> his copyright (property).  Insofar as the demand was
> ignored, the defendants infringed on this property
> right from May of 2013 to mid-January of 2014 (when
> they actually stopped using JOINT).  . . .  Pre-
> deprivation due process was not feasible as the acts
> were unpredictable.  Post-deprivation due process
> remedies are not available through state courts.  The
> decision to ignore the cease-and-desist notification

> constitutes a knowing, "willful" disregard for the
> plaintiff's rights.

Am. Compl. (Doc. No. 45) 12.  Defendants argue that they are
entitled to judgment as a matter of law on plaintiff's due
process claim because: (1) Roy had no property interest in
JOINT, due to the DOC's ownership of it, as a work for hire; (2)
Roy is equitably estopped from bringing a due process claim; and
(3) Roy granted the DOC an implied irrevocable license to use
JOINT.

It is well established that "[a] copyright is a property
interest protected under the Due Process Clause." Nat'l Ass'n
of Bds. of Pharm. v. Bd. of Regents, 633 F.3d 1297, 1317 (11th
Cir. 2011) (citing Roth v. Pritikin, 710 F.2d 934, 939 (2d Cir.
1983); Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll.
Sav. Bank, 527 U.S. 627, 642 (1999)).  Roy's due process claim
is premised on the DOC's failure to comply with his May 2013
cease-and-desist letter.  But, as the court has already
explained, the license Roy attempted to revoke with that letter
was irrevocable.  Because the DOC was in lawful possession of
the property interest on which Roy bases his due process claim,
defendants are entitled to judgment as a matter of law on that
claim.

## C.    **Unjust Enrichment & Conversion**

Roy claims that the DOC and Nichols are liable to him for unjust enrichment, under New Hampshire common law, for encouraging him to develop the predecessor modules to JOINT and then taking them for their own use.  He also claims that the DOC and Nichols are liable to him for conversion, under the common law of New Hampshire, for retaining at least three physical copies of JOINT in DVD form.  In the absence of any viable federal claim, the court declines to exercise supplemental jurisdiction over Roy's state law claims.  See 28 U.S.C. § 1367(c)(3); Camelio v. Am. Fed'n, 137 F.3d 666, 672 (1st Cir. 1998).

## **Conclusion**

For the reasons detailed above, defendants' motions for summary judgment, document nos. 74 and 76, should be granted.

Any objection to this report and recommendation must be filed within 14 days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  Failure to file an objection within the specified time waives the right to appeal the district court's order.  See United States v. De Jesús-Viera, 655 F.3d 52, 57 (1st Cir. 2011); Sch. Union No. 37 v. United Nat'l Ins. Co., 617

F.3d 554, 564 (1st Cir. 2010) (only issues fairly raised by

objections to magistrate judge's report are subject to review by

district court; issues not preserved by such objection are

precluded on appeal).

Andrea K. Johnstone
United States Magistrate Judge

March 2, 2016

cc:  Steven J. Roy, pro se
     Thomas J. Donovan, Esq.
     Francis Charles Fredericks, Esq.